Lamar Fleming, Jr. v. Commissioner.
Fleming v. Commissioner
Docket No. 27529.
United States Tax Court
1951 Tax Ct. Memo LEXIS 144; 10 T.C.M. (CCH) 764; T.C.M. (RIA) 51229; August 10, 1951
*144 On October 4, 1946, petitioner gave to his son 15,000 shares of Anderson, Clayton & Co. common stock. On the same date he gave to each of his two daughters 10,000 shares of the same stock. Petitioner in his gift tax return valued the stock at $50 per share, or a total of $1,750,000. The Commissioner in his determination of the deficiency valued the stock at $58 5/8 per share which was the mean between the high and low for which 800 shares were sold on the New York Stock Exchange on October 4, 1946. Held, the evidence shows that so large a block of stock as 35,000 shares could not have been sold on the date in question or during any reasonable period thereafter for $58 5/8 per share. Held, further, that after giving consideration to all the relevant factors determining the fair market value of the shares on the basic date, it is determined that the fair market value of each of the shares which petitioner gave away to his son and two daughters was $54 1/2 per share. John C. White, Esq., 838 Transportation Bldg., Washington, D.C., for the petitioner. J. Frost Walker, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in petitioner's gift tax for the year 1946 of $103,645.07. The Commissioner in his deficiency notice explained the deficiency as follows: "The proposed deficiency results from the following adjustments: SCHEDULE A
Tentatively
Returned
Determined
Item 1
$750,000.00
$879,375.00
Item 2
500,000.00
586,250.00
Item 3
500,000.00
586,250.00
To balance
301,875.00
"It has been determined that the fair market value of the common stock of Anderson, Clayton & Company was $58 5/8 a share on October 4, 1946. As you made gifts of $35,000 shares of the common stock of Anderson, Clayton & Company on October 4, 1946 which you returned for gift tax purposes at $50.00 a share your total gifts have been increased accordingly by $301,875.00." *146 Petitioner by appropriate assignments of error contests the correctness of the adjustments which the Commissioner has made. Findings of Fact Many of the facts have been stipulated and we adopt the stipulated facts as part of these findings of fact and incorporate them herein by reference. Petitioner resides in Houston, Texas, and filed his gift tax return for the calendar year 1946 with the Collector for the First District at Austin, Texas. On October 4, 1946, petitioner transferred by gift 35,000 shares of the common stock of Anderson, Clayton & Co. to his three children: 15,000 to Douglas K. Fleming, and 10,000 shares each to Clare Fleming and Mary Fleming. The stock transferred was the community property of petiand his wife. Throughout 1946 petitioner was the president and a director of Anderson, Clayton & Co., Houston, Texas. The company will sometimes hereafter be referred to as A. C. & Co. On October 4, 1946 and immediately prior to the gifts in question, petitioner owned 158,522 shares of the commmon stock of that company and was one of three trustees of various trusts owning 391,480 shares of such stock. On October 4, 1946 and after April, 1945, A.C. & Co. had outstanding *147 1,501,030 shares of common stock. Of this amount, on October 4, 1946, and immediately prior to the gifts in question, 169,702 shares or 11.3 per cent were outstanding in the hands of brokers and the general public; 479,321 shares or 31.9 per cent were registered in the names of officers and directors; 760,595 shares or 50.7 per cent were registered in the names of employees or the families of employees, officers and directors, the Clayton family and trusts; and 91,412 shares or 6.1 per cent were registered in the name of M. D. Anderson Foundation. There were about 1,600 shareholders in all. A registered public offering of 250,000 shares of the common stock of A.C. & Co. was made in April 1945 at a price of $44 a share by Morgan, Stanley & Co. and associated underwriters with net proceeds to the seller, the M. D. Anderson Foundation, of $41.75 a share. The common stock of the company was listed on the New York Stock Exchange on and after April 30, 1945. The A.C. & Co., directly and through subsidiaries, is engaged primarily in merchandising servicing, and processing cotton and cottonseed. Its operations embrace three separate but integrated businesses, cotton merchandising, warehousing *148 and compressing cotton, and cottonseed oil milling and cotton ginning. The company keeps its books and makes its returns on a fiscal year basis ending July 31 of each year. The net sales and operating revenue, net income and dividends paid by the company for 1938 to 1946 were as follows: Sales and
Net Operat-
Dividends
Year
ing Revenue
Net Income
Paid
1938
$150,163,435
$ 4,736,527
$ 3,175,071
1939
133,679,475
68,921
762,649
1940
214,711,111
6,670,209
1941
131,085,415
4,325,857
2,638,428
1942
227,642,526
8,910,228
2,681,818
1943
256,901,589
6,696,878
1,307,408
1944
272,134,230
6,516,576
2,148,238
1945
246,479,635
5,993,835
2,247,812
1946
268,194,884
14,006,998
3,152,163
The earnings and dividends per share were as follows: Year
Earnings
Dividends
1938
$3,16
$2.12
1939
0.05
0.51
1940
4.44
1941
2.88
1.76
1942
5.94
1.72
1943
4.46
0.87
1944
4.34
1.43
1945
3.99
1.50
1946
9.33
2.10
Average
$4.28
$1.33
The amounts of $2.52 of the 1944 earnings, $2.37 of the 1945 earnings, and $5.89 of the 1946 earnings were those of foreign subsidiaries earned abroad. The general stock *149 market situation was nervous in the Fall of 1946. On September 3, 1946, the Dow-Jones industrial average declined 10.51 points to 178.68, compared to a high of 212 1/2 on May 29, 1946. It closed at 165.17 on September 19, and stayed in the area of 160-179 during the remainder of 1946. The SEC and Stock Exchange asked for financial condition reports of all registered dealers and brokers prompted by the market decline. Few new issues were being offered during this period of time. Before, on, and after October 4, 1946 until October 15, 1946, the market prices of A.C. & Co. common stock were going up at times when the Dow-Jones industrial averages were going down. On October 4, 1946, the date of the gifts, 800 shares of the stock of A.C. & Co. were traded on the New York Stock Exchange at prices ranging from 57 7/8 to 59 1/2. From its listing in April 1945 through February 1947, the stock has sold in a range of 38 1/2-64 1/2. The following table shows the transactions on the Exchange during the months of September and October, 1946: Vol-
Date
ume
High
Low
Close
Bid
Asked
Sept. 3
100
55
55
55
4
800
51 1/2
49 1/2
51 1/2
5
700
54
51 3/4
54
6
200
54
54
54
9
500
54
52 1/2
52 1/2
10
700
52 1/4
52
52
11
600
52 1/2
52
52
12
500
52
51 1/2
52
13
52
53 1/2
16
300
53
53
53
17
200
53
52
53
18
52
53
19
1,500
53 1/2
52
52 1/2
20
1,600
52
51 1/2
52
23
400
52 1/2
52
52
24
400
52 1/2
52
52 1/2
25
100
54
54
54
26
53
54 1/2
27
53
54 1/2
30
1,300
55 3/4
53
55 3/4
Oct. 1
55
57
2
55
57
3
700
57 1/2
57
57 1/4
4
800
59 1/2
57 7/8
59 1/2
5
400
60
59 7/8
60
7
900
61 1/2
57 1/2
57 1/2
8
500
58
57 1/2
57 1/2
9
100
57
57
57
10
200
55
55
55
11
400
58
58
58
14
57
59
15
100
59 1/2
59 1/2
59 1/2
16
200
59 1/2
59
59
17
1,000
57
57
57
18
200
54 1/2
54
54
19
400
55
55
55
21
500
58
55 1/2
58
22
56 1/2
58 1/2
23
56
58
24
600
58
56 1/2
56 1/2
25
55 1/2
58
26
55 1/2
57 1/2
28
800
55 1/8
55
55
29
600
52 1/2
55 1/4
30
1,700
51 1/2
51
51 1/2
31
600
52 3/4
52
52 3/4
*150 The common stock of A.C. & Co. is an inactive stock upon the New York Stock Exchange and the market quotations are not indicative of the price which could be obtained for as large a block as 35,000 shares. These 35,000 shares of stock of A.C. & Co. could not have been sold on the New York Stock Exchange on October 4 without driving the stock to a considerably lower level of prices for the stock than those which prevailed for that date. The only feasible way by which 35,000 shares of A.C. & Co. stock could have been marketed on October 4, 1946, would have been by the method of a secondary distribution. A "secondary distribution" is a process by which a large block of stock is placed on the market through an underwriting syndicate and distributors immediately after the close of the market. This method of the sale of stock by blocks is practically equivalent to a sale by wholesale. Adequate compensation must be paid by the seller to those engaged in this operation. The approval of the Stock Exchange is required before such a distribution is offered. Protective measures covering the seller, the brokers, and the buying public are carefully imposed and observed. The fair market value *151 of each share of a block of 35,000 shares of the common stock of A.C. & Co. on October 4, 1946, or of three blocks of 15,000, 10,000, and 10,000 shares, respectively, was $54 1/2. The value of petitioner's gift to his son Douglas was $817,500, the value of his gift to his daughter Clare was $545,000, and the value of his gift to his daughter Mary was $545,000. Petitioner in his gift tax return reported the value of the 35,000 shares of stock at $50 per share, or a total of $1,750,000 and paid a net gift tax of $481,983.57. Some other gifts not involved here were included in the return. As has already been stated, the Commissioner determined that these 35,000 shares should be valued at $58 5/8 per share, or a total of $2,051,875. This was an increase of $301,875 over the value of these shares as reported by petitioner. Opinion BLACK, Judge: The question which we have to determine is the fair market value of 35,000 shares of Anderson, Clayton & Co. common stock on October 4, 1946. On that date petitioner gave to his son 15,000 shares of A.C. & Co. stock, and on the same day he gave to each of his two daughters 10,000 shares of the stock. Of course, each of these were separate gifts *152 and each has to be valued separately. However, both the expert witnesses of petitioner and those of respondent seem to agree that it is unimportant in arriving at valuation in this case whether we take up each block of stock separately or whether we have regard to the gifts in the aggregate, totaling 35,000. In either event the valuation per share will be the same. Cf. . The applicable statute and regulations are printed in the margin. [1]
*153 The Commissioner in his determination of the deficiency has arrived at the fair market value of the stock by using the mean between the highest and lowest quoted prices on the New York Stock Exchange on the 4th of October, 1946, and in so doing he arrived at a valuation of $58 5/8 for each share of the stock. We are convinced from the evidence that the 35,000 shares of stock did not have that high fair market value on the date of the gifts. The inactivity of the stock, the fact that there were only slightly over 1,600 stockholders, and the fact that 80 per cent of the stock was closely held resulted in a thin market. From the evidence which has been presented to us we have concluded that the 35,000 shares in question could not have been marketed on October 4, 1946, or during any reasonable period of time thereafter, at $58 5/8 per share. It seems clear to us that figure must be considerably discounted to arrive at the stock's fair market value on the basic date. In their briefs the parties discussed at length the numerous cases relating to the blockage factor in the valuation of large blocks of stock, which principle has been recognized by the courts. The nature of the problems *154 of determining the value of shares of stock was explained in , affirming Memorandum Opinion of the Board of Tax Appeals, as follows: "It is conceded that the question of value is a question of fact and the findings which the Board made upon the issue of value is not reviewable here if the values found are supported by substantial evidence. 'But the question of what criterion should be employed for determining the "value" of the gifts is a question of law.' . * * *" The court later in its opinion considered the blockage factor in valuation, saying: "* * * As well as any controverted question of administrative law may be settled without declaration by the Supreme Court, it is established that the size of a block of listed stock may be a factor to be considered in its valuation for gift or estate tax purposes. Where, as in this case, the taxpayer affirmatively shows that a block of listed stock to be valued is very great in comparison with the amounts of the stock which have been traded in on the exchange where it is listed, that the block of stock *155 could not be sold on such market at its quoted prices within a reasonable time by skilled brokers following prudent practices for liquidation and that the true value of the block of stock is in fact different from the price quotations, then the taxpayer is entitled to have all other proper evidence of the value of the block of stock considered together with the market quotations. * * *" In a later case than the Maytag case, supra, namely, , affirming Memorandum Opinion of the Tax Court [, the court said: "The Commissioner was required to determine the fair market value of the stocks as of the time of Stewart's death; that is to say, as of December 11, 1937. While presuming that a willing buyer and a willing seller will arrive at fair market value, we think it must be assumed also that the buyer and seller possess knowledge of essential facts. An essential fact imputed to the buyer by the Tax Court was that substantial margins below market prices would have been required to secure a secondary distribution of the stocks. The Tax Court, finding such margins indispensable to a valuation of fair *156 market price on the critical date adhered to that part of subparagraph (c) of Article 10 of Regulations 80 which provides 'In cases in which it is established that the value per * * * share * * * determined on the basis of selling or bid and asked prices * * * does not reflect the fair market value thereof, then some reasonable modification of such basis or other relevant facts and elements of value shall be considered in determining fair market value.' "The untenable position of the Commissioner is further demonstrated by the fact that the sentence which followed the word 'value', last occurrence in the above quotation was dropped from the amended regulations. That sentence was: 'The size of the holdings of any security to be included in the gross estate is not a relevant factor and will not be considered in such determination.' As pertinent as the foregoing is the fact that subparagraph (a) of Article 10, prior to amendment, contained the clause 'or by an estimate of what a whole block or aggregate would fetch if placed upon the market at one and the same time', now omitted. The clause quoted followed the sentence of the present regulation: 'The fair market value of a particular *157 kind of property includible in the gross estate is not to be determined by a forced sale price'. The only reasonable explanation for the amendments lies in the recognition of the Treasury Department that large blocks of stock under certain circumstances require a margin for redistribution and that this fact may be deemed to affect the fair market value of stock." See also our discussion in , affirmed . It seems to us that petitioner has affirmatively shown by competent evidence that the 35,00 shares of A.C. & Co. stock here involved could not have been sold on October 4, 1946, for $58 5/8 a share, or within any reasonable time thereafter, by skilled brokers following prudent practices of selling such a size block of stock and that the true fair market value of these shares of stock aggregating 35,000 shares was in fact considerably less than the quoted prices on the New York Stock Exchange on that date. Petitioner introduced the testimony of two well-experienced men who had long been engaged in the business of marketing securities. They were both ranking partners in the investment *158 banking firm of Morgan, Stanley & Co. of New York City. The substance of their testimony was that the only feasible and practical method of marketing such a large block as 35,000 shares of A.C. & Co. stock on October 4, 1946, would have been by the method of secondary distribution and that by the use of that method it was their opinion that petitioner would not have received more than $50 per share for the stock, net to him. Respondent introduced the testimony of two expert witnesses. One of them was a partner in an investment counsel firm located in Chicago, Illinois, and the other was a valuation engineer in the office of Chief Counsel, Engineers and Auditors Section, Bureau of Internal Revenue. Both of these witnesses gave as their opinion that $58 5/8 which was the mean of the high and low on the New York Stock Exchange of A.C. & Co. stock on October 4, 1946, represented the fair market value of the stock at the date of the gifts. Notwithstanding this testimony of respondent's two expert witnesses, we are convinced from all the evidence that 35,000 shares of such stock could not have been sold on that date or during any reasonable period of time thereafter at that high a price. *159 Respondent's own principal witness, the one who was a partner in an investment counsel firm, testified that in his own opinion the only practical way to have marketed such a large block of stock would have been by way of a "secondary distribution." On that point he testified: "A. Well, it is perfectly evident from previous action of the stock - that is previous to October 4th - to actually sell 35,000 shares on the New York Stock Exchange without any other help would have taken so long a time that you couldn't have guessed what price you would have ultimately realized on the average, so that would be the reason for trying to localize the selling so that you would have a price that you have some idea or some control over." This witness testified that the 35,000 shares could have been sold at or only a little below the closing market price on October 4, 1946, netting the petitioner between $56 1/8 and $57 a share through a secondary distribution. We are convinced, however, from the testimony of petitioner's expert witnesses and other evidence in the record that the 35,000 shares of stock could not have been marketed at that high a price through a secondary distribution or any other *160 method. While we are convinced that so high a price could not have been received on the basic date, we are also convinced that petitioner's two expert witnesses placed the price too low when they gave it as their opinion that the 35,000 shares could not have been marketed through a secondary distribution at a higher price than that which would have netted petitioner $50 per share. In giving their opinion as to the $50 figure, petitioner's two witnesses laid much stress on the fact that the general stock market situation was nervous in the Fall of 1946. On September 3, 1946, the Dow-Jones industrial average declined 10.51 points to 178.66 compared to a high of 212 1/2 on May 29, 1946. It closed at 165.17 on September 19 and stayed in the area of 160-179 during the remainder of 1946. While the foregoing facts are true and must be given their proper weight in determining the fair market value of the stock on the basic date, it is also true that during the time that the Dow-Jones industrial average was declining, A.C. & Co. stock was definitely showing independent strength. The evidence shows why this was true. A.C. & Co. during its fiscal year ended July 31, 1946, had one of the most *161 prosperous years in its history and the public, at least to some extent, was informed of that fact. It was this factor which doubtless caused A.C. & Co. stock to show independent strength during the same period of time that the Dow-Jones industrial averages were declining. When petitioner's two expert witnesses testified that in their opinion the 35,000 shares of stock in question did not have a higher fair market value to petitioner $50than on October 4, 1946, they failed to give sufficient consideration, we think, to the favorable factor to which we have just referred. While we have been discussing above the expert testimony, we would like also to emphasize that there is much other testimony in the record relevant to value. The only oral testimony was that of the expert witnesses but there is much other evidence of a statistical and documentary nature in the stipulated facts and exhibits. We have endeavored to give all this evidence due and proper consideration in arriving at our finding of fact that the stock had a fair market value on October 4, 1946, of $54 1/2 per share. We have considered the history of the company, the ability of its management, and the nature of business *162 in which the company is engaged. We have considered also that past earnings record of the company, its prospects for future earnings, its dividend record, its balance sheets, and the book value of its shares of stock. We have studied the market price quotations of the shares, the volume of trading in company stock near the date of gift, and also the general condition of the securities market prevailing at that time. We have, as has already been made plain, carefully considered the testimony of the expert witnesses. After a consideration of the facts just enumerated and all others adduced at the hearing, we have determined for the gifts at issue in this proceeding a value of $817,500 for the 15,000 shares which the petitioner gave to his son, and $545,000 each for the 10,000 shares of stock which he gave to each of his two daughters. Decision will be entered under Rule 50. Footnotes
1. Internal Revenue Code. SEC. 1005. GIFTS MADE IN PROPERTY. If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. Regulations 108. Sec. 86.19. Valuation of Property. - (a) General. - The statute provides that if the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. The value of a particular kind of property is not to be determined by a forced sale price. Such value is to be determined by ascertaining as a basis the fair market value at the time of the gift of each unit of the property. For example, in the case of shares of stock or bonds, such unit of property is a share or a bond. All relevant facts and elements of value as of the time of the gift should be considered. * * *
(c) Stocks and bonds. - The value at the date of the gift in the case of stocks and bonds, within the meaning of the statute, is the fair market value per share or bond on such date. In the case of stocks and bonds listed on a stock exchange, the mean between the highest and lowest quoted selling prices on the date of the gift shall be considered as the fair market value per share or bond. * * *
In cases in which it is established that the value per bond or share of any security determined on the basis of selling or bid and asked prices as herein provided does not reflect the fair market value thereof, then some reasonable modification of such basis or other relevant facts and elements of value shall be considered in determining fair market value.↩